1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCUS L. HARRISON,                            No. C 04-5456 SI (pr)

        Plaintiff,                          **ORDER GRANTING SUMMARY
                                               JUDGMENT**

    v.

R. McDONALD,

        Defendant.
_____/

## INTRODUCTION

    This case is now before the court for consideration of defendant's motion for summary judgment.  For the reasons discussed below, the motion will be granted and judgment entered in defendant's favor and against plaintiff.

## BACKGROUND

    Marcus Harrison alleged in his complaint that correctional officer R. McDonald allowed him to be attacked by another inmate by opening the door for the wrong cell.  McDonald does not dispute that he opened the wrong cell door, but contends that it was, at most, negligence. The following facts are undisputed unless otherwise noted.

    The incident in question took place on April 10, 2004 in Pelican Bay State Prison's security housing unit ("SHU").  At the time, Harrison was serving a sentence for an attempted murder conviction and McDonald was a correctional officer who had been employed at Pelican Bay for about two years.  On the day of the incident, McDonald was the control booth operator.

United States District Court
For the Northern District of California

1   The control booth is an elevated enclosed octagonal booth, about seven feet above the

2   floor, about 12'x12', with sliding windows facing six SHU pods, such that it is like the center of

3   a half-circle with six pods extending outward like the spokes from that center.  Each pod has two

4   tiers, with four cells lining one side of the bottom tier and four cells lining the same side of the

5   top tier.  Each pod can hold 8-16 inmates, depending on whether they are single- or double-

6   celled.  In addition to the cells, there are six exercise yards for the inmates, and each inmate is

7   assigned to a specific yard for a specific time.

8       Staff members are not stationed in the pods, and staff responding to an emergency must

9   first enter the unit and then enter the pod from inside the rotunda area of the unit.  The control

10  booth operator controls the doors, lights, intercom system, and three viewing monitors.  As the

11  control booth officer, McDonald was responsible for overseeing the movements of staff and 48-

12  96 inmates.  It was also his job, as the control booth officer, to provide armed gun coverage for

13  the floor officers during escorts, counts, meals, searches, mail delivery and pick-up and staff

14  responding to an emergency.

15      The door control panel is located in the rotunda control booth along with several yard

16  monitors, a control panel for lights and one for the intercom system.  The control panel is

17  approximately 2'x3' and has about 90 switches.  Each switch is labeled for identification

18  purposes.  Each switch that operates a cell door is identified by the cell number and the inmate's

19  name.  According to McDonald, the switch is turned by inserting a key into the plexiglass cover

20  over the panel and the key is turned to the right or the left, depending on whether the officer

21  wants to open or close the door.  Pelican Bay's SHU Operations Procedure No. 222 describes

22  an additional safeguard of colored plugs on the control panel not mentioned by McDonald.

23  "After the inmate's cell is secured, the Control Booth Officer will insert a yellow 'yard plug' into

24  the keyhole of the inmate's cell number on the control panel.  This will ensure the officer knows

25  which inmate(s) is on the yard."  Complaint, Exh. A, p. 15 § 9(f).

26      In the SHU, only one inmate is allowed out of his cell at a time.  Thus, the normal

27  practice with regard to an inmate's exercise session would be as follows:  (1) the control booth

28  operator operates the switch for the inmate's cell door to open, (2) the inmate exits the cell, (3)

2

United States District Court
For the Northern District of California

the control booth operator operates the switch for the cell door to close, (4) the inmate goes to the assigned exercise yard, (5) the control booth operator operates the switch for the exercise yard door to open, (6) the inmate enters the exercise yard, (7) the control booth operates the switch for the exercise yard door to close, (8) the inmate has his exercise session, (9) the control booth operator operates the switch for the exercise yard door to open, (10) the inmate exits the exercise yard, (11) the control booth operator operates the switch for the exercise yard door to close, (12) the inmate goes back to his cell and stands in front of it, (13) the control booth operator operates the switch for the inmate's cell door to open, (14) the inmate enters the cell, (15) the control booth operator operates the switch for the cell door to close.  The process is then repeated for the next inmate to go to that exercise yard, although this process is also occurring for other exercise yards, apparently followed so that up to six inmates can be having exercise sessions at the same time but done so that only one inmate is in the common area at a time and no more than one door is open at the any time.

Here, the problem occurred at step 13, when McDonald caused the wrong cell door to be opened.  After his exercise session, Harrison went back to his cell and stood in front of it. McDonald opened the door for the cell right next to Harrison's cell, in which inmate Evans was housed.  Although Harrison and McDonald agree that this was the sequence of events that occurred here, this sequence is different from the sequence described in OP No. 222 for the return of an inmate from the exercise yard.[1]  Complaint, pp. 4-5; McDonald Decl.,  ¶ 7.

McDonald provided a declaration in which he states that his error was inadvertent and unintentional.  He believes the key had been left in the slot for Evans' cell because Evans had just returned to his cell before Harrison entered the pod.  Being unfamiliar with both inmates, McDonald mistakenly flipped that switch assuming it was the correct switch for Harrison.

---

[1]OP No. 222 states that when an inmate is returned from the yard, the control booth officer will visually inspect the pod and view the control panel to ensure all inmates are secured in their cells and then "will remove the yellow 'yard plug,' open the inmate's cell door, and visually ensure the correct door was opened by looking at the door and double-checking the control panel to ensure the correct light is blinking. . . .  Once the Control Booth Officer is positive the correct cell door has been opened, the yard door will be opened, allowing the inmate to proceed safely to his cell."  Complaint, Exh. A, p. 16, §13.

United States District Court

For the Northern District of California

1   McDonald immediately realized he had opened the wrong door when Evans rushed out and

2   attacked Harrison.

3          When Evans rushed out and attacked Harrison, McDonald verbally ordered the two

4   inmates in the pod to immediately "get down" and "stop."  Harrison and Evans ignored

5   McDonald's orders.  Almost simultaneously, McDonald activated his emergency alarm in the

6   control booth and within seconds after the alarm sounded, ten staff officers responded to the

7   alarm and were at the perforated pod door. One of the responding officers immediately opened

8   the cuff port in the door to the pod area to use pepper spray to stop the altercation.  As soon as

9   the cuff port was opened, Evans stopped fighting and returned to his cell. As a result, pepper

10  spray was not used.  Meanwhile, McDonald provided cover for the responding staff and closed

11  Evans' cell door as soon as Evans retreated into the cell.  Harrison does not disagree with

12  McDonald's estimate that the entire incident was about 10 seconds in length.  Harrison was

13  removed from the pod and examined for any injuries.  The medical report notes that Harrison

14  denied having any injuries and said he was "O.K."  Pappan Decl., Ex. E.

15

16                          **VENUE AND JURISDICTION**

17          Venue is proper in the Northern District of California because the events or omissions

18  giving rise to Harrison's claims occurred at Pelican Bay in Del Norte County, which is located

19  within the Northern District.  See 28 U.S.C. §§ 84, 1391(b).  This Court has federal question

20  jurisdiction over this action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

21

22                   **LEGAL STANDARD FOR SUMMARY JUDGMENT**

23          Summary judgment is proper where the pleadings, discovery and affidavits show that

24  there is "no genuine issue as to any material fact and [that] the moving party is entitled to

25  judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court will grant summary judgment

26  "against a party who fails to make a showing sufficient to establish the existence of an element

27  essential to that party's case, and on which that party will bear the burden of proof at trial . . .

28  since a complete failure of proof concerning an essential element of the nonmoving party's case

Case 3:04-cv-05456-SI   Document 25   Filed 01/27/06   Page 5 of 12

**United States District Court**
For the Northern District of California

necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendant's challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendant's qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Harrison's verified complaint is considered in opposition to the motion for summary judgment.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W.

5

United States District Court

For the Northern District of California

1  Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence

2  must be viewed in the light most favorable to the nonmoving party, and the inferences to be

3  drawn from the facts must be viewed in a light most favorable to the nonmoving party.  See id.

4  at 631.

5

6                                                    **DISCUSSION**

7  A.       Eighth Amendment Claim

8          The Eighth Amendment's prohibition of cruel and unusual punishment requires that

9  prison officials take reasonable measures for the safety of inmates.  See Farmer v. Brennan, 511

10  U.S. 825, 834 (1994).  In particular, officials have a duty to protect inmates from violence at the

11  hands of other inmates.  See id. at 833.  A prison official violates the Eighth Amendment only

12  when two requirements are met:  (1) the deprivation alleged is, objectively, sufficiently serious,

13  and (2) the official is, subjectively, deliberately indifferent to the inmate's safety.  See id. at 834.

14          To be liable in a failure to prevent harm situation, the official must know of and disregard

15  an excessive risk to inmate safety.  See id. at 837.  The official must both be aware of facts from

16  which the inference could be drawn that a substantial risk of serious harm exists, and he must

17  also draw the inference.  See id.  He need not "'believe to a moral certainty that one inmate

18  intends to attack another at a given place at a time certain before [he] is obligated to take steps

19  to prevent such an assault.'"  Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) (citation

20  omitted).  Before being required to take action he must, however, have more than a "mere

21  suspicion" that an attack will occur.  Id.; see, e.g., id. at 460 (summary judgment appropriate as

22  to defendants when plaintiff "failed to come forward with facts showing that these defendants

23  had any reason to believe he would be attacked by the assailant").

24          When, as here, the prisoner seeks damages against a defendant, the "inquiry into

25  causation must be individualized and focus on the duties and responsibilities of each individual

26  defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  Leer

27  v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).  Leer explained that "it is important to distinguish

28  the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed

to damages." Id.  In the former case, a broader and more generalized approach to causation is taken.  See id.

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined.  We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference.  In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant.  . . . Sweeping conclusory allegations will not suffice to prevent summary judgment.  . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

Id. at 633-34 (citations omitted).

The dispute here focuses on McDonald's mental state when he acted because the parties agree about the sequence of events in this case.  McDonald met his summary judgment burden by pointing to the absence of evidence that he acted with deliberate indifference at the time he opened inmate Evans' cell door.   Harrison has offered no evidence showing deliberate indifference or from which deliberate indifference could be inferred.  This failure of proof is fatal to Harrison's case.  Summary judgment cannot be avoided by a non-moving plaintiff by simply asserting the defendant acted with the required mental state of deliberate indifference or asserting that deliberate indifference is self-evident from the fact that the incident occurred.

Although McDonald opened the wrong cell door, one cannot infer from that fact alone that McDonald opened that door with deliberate indifference to a substantial risk to Harrison's safety.  The set-up of the SHU is such that the doors are operated by remote control, so this is not a case where a jailer walks around with a set of keys and is physically standing at the door of the wrong cell and can see that he is opening the wrong door before he opens it.  The most favorable evidence for Harrison is that McDonald's actions did not comport with the yard-release procedure described in the OP No. 222 in that McDonald did not put a yellow plug in Harrison's cell door key to show that Harrison was the inmate in the exercise yard.  This is further evidence of negligence, but negligence is not actionable under the Eighth Amendment.  See Farmer, 511 U.S. at 835-36 & n.4.  The fact that McDonald opened the wrong cell door while failing to follow the written procedure is not enough to raise a triable issue of fact that McDonald acted

7

United States District Court

For the Northern District of California

1   with deliberate indifference to Harrison's safety.

2      The undisputed evidence is inconsistent with deliberate indifference by McDonald. As

3   soon as he realized he opened the wrong door, McDonald acted swiftly and the incident was over

4   within about 10 seconds. Immediately after opening the wrong door, McDonald sounded an

5   alarm which brought ten staff members to respond to the emergency, and Evans retreated to his

6   cell apparently when he realized he was going to be pepper-sprayed if he did not do so.

7   Harrison's assertions that "this was a deliberate set-up" and that "McDonald acted with deliberate

8   & malicious intent," Complaint, pp. 5, 6, are speculative and unsupported by any evidence.

9      Harrison also fails to raise a triable issue of fact that McDonald knew inmate Evans

10  presented a substantial risk to Harrison's safety. McDonald did not know either Harrison or

11  Evans before the incident. And there is no evidence that Harrison and Evans were known

12  enemies. The only evidence on this point shows that they were not documented enemies until

13  after the incident. See Opposition, Exh. A (May 24, 2004 CDC-128 B "Based on the above

14  circumstances it is required that HARRISON and EVANS be documented as enemies of each

15  other and this fact be noted on their respective CDC 812s.") There is no evidence in the record

16  that every inmate will attack any other inmate as soon as the opportunity presents itself, and the

17  court declines to engage in the racist assumption that Harrison invites with his statement that a

18  danger was obvious because he was Black and Evans was white. See Opposition, p. 5. The

19  incident took place in the SHU, which is a more restricted environment for prisoners and has

20  some more violent prisoners (as well as some persons housed there for administrative reasons),

21  but there is no evidence that Harrison was in particular danger from Evans and, even if there

22  was, there is no evidence that McDonald knew of that danger. Under the prison's operations

23  manual, the inmates would not even have been eligible for unescorted movement to the yard if

24  they had a history of disruptive behavior. See OP. No. 222, § 9.

25     McDonald also has identified the absence of evidence that Harrison suffered any physical

26  injury due to McDonald's actions. The absence of a physical injury would be fatal to Harrison's

27  claim for compensatory damages for emotional injuries, such as feeling stressed or scared.

28  See 42 U.S.C. § 1997e(e). The medical report prepared on the day of the incident states that

Harrison suffered no noteworthy injury: patient "denies any injury. None noted." Pappan Decl., Exh. E.   Harrison tries to show the existence of a triable issue of fact on the existence of a physical injury by contending that he suffers from post-traumatic stress and from a heart problem.   However, there is no evidence that his "post-traumatic stress" is anything more than a self-diagnosis, there is no evidence that such stress is a physical injury, and there is no proof of a causal connection between the stress and the incident.   It is nothing more than a guess that this one incident caused the stress felt by a person who was no stranger to violence and had been in and out of prisons for about a decade.   See Harrison v. Ayers, No. C 00-2134 SI, Order Denying Petition For Writ Of Habeas Corpus, pp. 2-3 (describing domestic violence and stabbing that led to Harrison's attempted murder conviction); see also Pappan Decl., Exh. D. Likewise, it is only a guess that Harrison's heart problem was caused by the door-opening incident.   Harrison's treadmill stress test report shows an abnormal result but does not identify the cause of the abnormality and in any event was done more than a year after the incident.   See Opposition, Exh. C (May 23, 2005 treadmill stress test).   His EKG test strip also does not identify the cause of any abnormality, also was done more than a year after the incident, and has a handwritten note suggesting that Harrison had a heart problem predating the April 10, 2004 cell door incident.   See Opposition, Exh. C, (April 12, 2005 EKG strip, with handwritten note, "Since 1.19.02 inferior Tw inversions are greater – R/O ischemia).   Harrison has offered no evidence that shows or supports a reasonable inference that he suffered physical injury at the hands of inmate Evans when the cell door was opened.   The absence of a physical injury is fatal to Harrison's claim for compensation for emotional injuries because, without a physical injury, 42 U.S.C. § 1997e(e) precludes recovery for mental or emotional injury suffered while an inmate is in custody.

In sum, there is an absence of evidence that Evans was known to be a danger to Harrison, an absence of evidence that McDonald acted with deliberate indifference, and an absence of evidence that Harrison suffered more than emotional injury from the incident.   When the evidence is viewed in the light most favorable to Harrison, and inferences therefrom drawn in his favor, a reasonable jury could not find that defendant McDonald was deliberately indifferent

1  to a known risk to Harrison's safety.  Defendant McDonald therefore is entitled to judgment as

2  a matter of law.

3

4  B.    Qualified Immunity Defense

5          The defense of qualified immunity protects "government officials . . . from liability for

6  civil damages insofar as their conduct does not violate clearly established statutory or

7  constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

8  457 U.S. 800, 818 (1982).  The rule of qualified immunity "'provides ample protection to all but

9  the plainly incompetent or those who knowingly violate the law.'"  Burns v. Reed, 500 U.S. 478,

10 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

11         In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a particular

12 sequence of questions to be considered in determining whether qualified immunity exists.  The

13 court must consider this threshold question:  "Taken in the light most favorable to the party

14 asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

15 right?"  Id. at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry

16 ends and defendants prevail.  See id.  If, however, "a violation could be made out on a favorable

17 view of the parties' submissions, the next, sequential step is to ask whether the right was clearly

18 established. . . .  'The contours of the right must be sufficiently clear that a reasonable official

19 would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry

20 in determining whether a right is clearly established is whether it would be clear to a reasonable

21 officer that his conduct was unlawful in the situation he confronted."  Id. at 201-02 (quoting

22 Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

23         The first step under Saucier is to determine whether a constitutional violation was alleged.

24 As a matter of pleading, plaintiff's complaint sufficed to allege an Eighth Amendment violation.

25 However, as shown in the section above, the evidence in the record does not establish an Eighth

26 Amendment violation.  Even if the evidence did establish such a violation, that would only

27 address the first step of the Saucier analysis.

28

United States District Court

For the Northern District of California

10

United States District Court

For the Northern District of California

The next step under <u>Saucier</u> is to consider whether the contours of the right were clearly established, an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Saucier</u>, 533 U.S. at 201.  The law was clearly established that a correctional officer could not disregard a substantial risk of serious harm to an inmate of which he was aware and had a duty to protect an inmate from violence at the hands of other inmates. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. at 833.  But there was no clearly established right for inmates to always be segregated and never allowed to come into contact with other inmates.

The Ninth Circuit clarified the qualified immunity analysis for a deliberate indifference claim in <u>Estate of Ford v. Ramirez- Palmer</u>, 301 F.3d 1043 (9th Cir. 2002).  The court explained that, for an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must <u>subjectively</u> have a sufficiently culpable state of mind, i.e., "'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences.' . . . Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high.  In these circumstances, he would be entitled to qualified immunity.  <u>Saucier</u>, 533 U.S. at 205." <u>Estate of Ford</u>, 301 F.3d at 1050 (quoting <u>Farmer v. Brennan</u>, 511 U.S. at 834).  In <u>Estate of Ford</u>, the court explained that even though the general rule of deliberate indifference had been expressed in <u>Farmer</u>, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" <u>Estate of Ford</u>, 301 F.3d at 1051 (quoting <u>Farmer</u>, 511 U.S. at 834 n.3).  Because it had not been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being <u>a</u> risk of <u>some</u> harm to a <u>substantial</u> risk of <u>serious</u> harm.  <u>Farmer</u> left that an open issue.  This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they]

United States District Court

For the Northern District of California

1    confronted." Estate of Ford, 301 F.3d at 1051 (emphasis in original).

2         Applying Estate of Ford here, it would not have been clear to a reasonable prison official

3    when the risk of harm from letting two inmates into the same common area -- inmates not known

4    to the officer to be enemies -- changed from being a risk of some (or even any) harm, to a

5    substantial risk of serious harm from one of those inmates.  A reasonable prison official

6    understanding that he could not recklessly disregard a serious risk to inmate safety could know

7    that not more than one inmate was allowed out of his cell at a time but reasonably perceive that

8    Harrison's exposure to any risk of harm was not that high when there was no evidence of a

9    specific threat from inmate Evans.  Because the law did not put McDonald on notice that his

10   conduct would be clearly unlawful, summary judgment based on qualified immunity is

11   appropriate.  See Saucier, 533 U.S. at 202.  McDonald met his burden of proof in his moving

12   papers and Harrison did not introduce evidence to show the existence of a genuine issue of fact

13   on the defense.  McDonald is entitled to judgment as a matter of law on the qualified immunity

14   defense.

15

16                              **CONCLUSION**

17        For the foregoing reasons, defendant is entitled to judgment as a matter of law on the

18   merits of plaintiff's Eighth Amendment claim as well as on defendant's qualified immunity

19   defense. Defendant's motion for summary judgment is GRANTED and judgment will be entered

20   in his favor.  (Docket # 10.)   The clerk shall close the file.

21        IT IS SO ORDERED.

22   Dated:  January 26, 2006                    _____

23                                               SUSAN ILLSTON
                                                 United States District Judge
24

25

26

27

28